## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SCOTT C. ANGLIN, | ) |
| Plaintiff | ) ) |
| v. | ) ) |
| CABELA'S OUTDOOR ADVENTURES, INC. and BARRY G. BURCHELL, | ) ) ) |
| Defendants. | ) ) ) |

COMPLAINT

### I.  Preliminary Summary

1. **Nature of the case**. This is a civil action for damages brought under the provisions of the Racketeering Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. sections 1961, 1962 and 1964(c) and (d).  These sections together create a civil right of action against "persons" who, in connection with an "enterprise" "affecting interstate or international commerce," injure another person in his "business or property" by "conduct which constitutes a pattern of racketeering" (1964(c)) or "conspire" to do so (1964(d)).  This action also includes a supplemental state law claim for additional damages for intentional infliction of emotional distress.

2. **Predicate Acts Which Injured Plaintiff.**  Plaintiff alleges injury to his business and property because of Defendants' pattern of proscribed RICO predicate acts including several aimed at stifling Plaintiff from revealing

to authorities or others the Defendants' continuing, extensive activities which violated numerous laws in the course of operating their "association in fact" "enterprise". Defendants sought to avoid disclosure of those unlawful activities and also some unethical practices including human rights abuses by Burchell. Those activities and conduct took place over at least eight years, 2002 through some time in the first half of 2010. The pattern of unlawful activities in Defendants' conduct of the enterprise affected interstate and international commerce, specifically commerce in the sale throughout the United States of guided African safaris or hunting trips, and then the provision of those trips in the Republic of South Africa and the Republic of Namibia, along with related businesses such as interstate and international travel booking and taxidermy work to produce animal trophies. Within the pattern of racketeering activity were several offenses directly affecting Plaintiff. Plaintiff as early as 2002 was the victim of several of the offenses, including illegal tax being added to his bill, being guided to hunt unlawfully on non-owned property without written permission, and having his trophies shipped home using illegal export-import documents. The specific predicate act offenses for which Plaintiff now seeks damages were committed over a period from January 2005 to the present and some are continuing. The entire pattern of unlawful conduct has potential to continue in the future, and to harm Plaintiff further as well as make additional victims of future customers of the enterprise. Plaintiff's damages claims center on violations by the two Defendants of 18 U.S.C. sections 1512 and 1513 which prohibit, respectively, intimidation and retaliation against witnesses, victims,

and informants involved in reporting suspected criminal activity; and also 18 U.S.C. sections 1341 and 1343, prohibiting use of the mail or wire transmissions for communications which are part of a fraudulent scheme. Each of those is a RICO predicate act identified by 18 U.S.C. section 1961, and there are a sufficient number of them to constitute a pattern of racketeering activity cognizable under the civil RICO statutes.

3.   **Plaintiff's discovery of Burchell's wrongful conduct.** Plaintiff purchased a hunting trip with Burchell through COA for 2002.  He became a victim of some of Burchell's fraudulent business practices, learned he had been duped in a transaction, and began to investigate in depth the ways Burchell operated his safari business.

4.   **Plaintiff's Report of Burchell's wrongdoing to authorities and to COA.**  In 2004 and early 2005, Plaintiff reported his suspicion of wrongdoing to governmental authorities and he also discussed the suspicions with a nephew, Paul Strickland, who was then a Florida police officer.  Plaintiff also tried truthfully to inform Defendant Cabela's Outdoor Adventures, Inc. (hereinafter "COA") about several illegal and unethical business practices of Barry G. Burchell (hereinafter "Burchell"), with regard to how he operated his hunting business providing safari hunting trips and related services.   As documentation for the reports, Plaintiff also sent COA in February 2005 a DVD of videotaped sworn statements of witnesses to some of the unethical and illegal behavior. Plaintiff also orally discussed details of the wrongdoing with a representative of COA, Reed Gilmore, an in-house attorney.   Plaintiff was

aware there was a relationship between Defendants, but he did not know the details of it then, or that the two were closely tied and interdependent in this enterprise's business. Burchell's customer base, on Plaintiff's present information and belief, was in fact primarily American hunting customers who bought such services from COA. Some of the Plaintiff's reports and disclosures of alleged and suspected wrongdoing dealt with Burchell's abuses of employees, illegal collection of Value Added Taxes ("VAT") from the customers, extortion or blackmail efforts by Burchell related to other litigation in which Burchell was involved, an attempt to procure perjury from Anglin's son in that litigation in South Africa, and routine breaches of the game laws of the African countries where the hunts took place. Breaches of the South African and Namibian laws and regulations governing hunting and transportation of animals and trophies, if proved, also would also constitute breaches of the principal United States law regulating the taking and transportation of protected and endangered plant and animal species, known as the Lacey Act, 16 U.S.C. sections 1371 to 1378, and particularly section 1372 which details the prohibited conduct. That section incorporates by reference and enforces the wildlife protective laws of other countries, in order to prevent "trafficking" in illegally taken wildlife, no matter where in the world it occurs. The Lacey Act focuses especially on illegally transporting, importing and exporting by use of false documentation. The Defendants' enterprise has violated those provisions with impunity for years.

5. **Defendants' Reaction to Plaintiff's Disclosures.** Plaintiff in early 2005 made clear to Defendant COA that he was an informant, and personally involved in reporting these suspected acts of illegality or other wrongdoing to government authorities. Further, that he was a victim of some of the wrongdoing, and that he was a witness to some of it. Those three categories -- witnesses, victims and informants -- are protected under the intimidation and retaliation prohibitions in 18 U.S.C. sections 1512 and 1513. Plaintiff tried, in other words to "blow the whistle" to COA on Burchell. COA and Burchell immediately conferred, collaborated and conspired to try to intimidate him to stop his disclosures and worked together on a fraudulent, baseless lawsuit in South Africa to retaliate against him for what he had already disclosed. They used electronic means of communication categorized as "wire" for federal statutory purposes in the anti-wire fraud statute, 18 U.S.C. section 1343, to plan and to try to advance their joint goal of intimidating, discrediting, punishing, and silencing Plaintiff. Plaintiff discovered detailed evidence establishing the existence and nature of the enterprise, the collaboration by Defendants in trying unlawfully to intimidate and retaliate against him for being a witness, informant and victim, and the extremely widespread nature of the hunting and tax related offenses, only after obtaining documents and depositions from COA in the late summer of 2010.

6. **Defendants' Actions Against Plaintiff.** Defendants in this case, first conspired to and then overtly did try to silence the plaintiff and intimidate him from any further such truthful disclosures of wrongdoing to

authorities or the public in the United States and in the African states of South Africa and Namibia. In part they did so by means of a threat from COA to publicize some negative past history about Plaintiff, and Burchell's actually publicizing it; but primarily they jointly discussed and by collaboration maintained the baseless, multi-count lawsuit featuring a defamation claim, filed in 2005 by Burchell against Plaintiff in the High Court of South Africa. Plaintiff has defended this international lawsuit vigorously, but at enormous cost. He has had to spend hundreds of thousands of dollars for lawyers, for investigation, and for evidence gathering, and also has suffered a crippling loss of managerial work time from his own solely owned, personally managed business, a hotel renovation and construction business based in San Antonio, Texas. In defending against the baseless suit, his own property and business have in those two ways been damaged. That South African lawsuit also included multiple other meritless claims by Burchell, which have already been tried to the court and rejected. A relatively small Burchell claim for a contested amount of an account or debt was resolved by the court for a fraction of the amount Burchell claimed, and fully paid by Plaintiff Anglin. But the core claim, yet to be tried, is the defamation damages claim dependent solely on a fraudulent and false assertion of an alleged two-year loss of customers and business from COA for the years of 2005 and 2006. Burchell falsely testified under oath that that was the period of his being given no new safari bookings by COA. COA, which knew the relevant facts about this, repeatedly refused even to respond to formal and informal requests from Plaintiff's counsel for

factual information.   In contrast, COA through its in-house attorney, Reed Gilmore, furnished Burchell in 2007 at his lawyers' request a misleading and factually inaccurate document, trying to substantiate the fiction of the shutoff of business, a shutoff that did not occur at all.  Notably, the document gave almost no details, but did falsely claim the limiting of business as to new customers happened for some unstated time, and that subsequently the regular business relationship was reinstated, again giving no dates. Defendants' collaborative effort to silence the Plaintiff may fairly be characterized as an attempted deception of the South African High Court adjudicating that defamation lawsuit.   Plaintiff claims directly resultant damages to his business and property as itemized further in this complaint, based on the RICO claims, and also additional damages based on the supplemental Texas state law claim for intentional infliction of emotional distress.

## II. Jurisdiction and Venue

7.   This court has federal question jurisdiction under 28 U.S.C. section 1331 and 18 U.S.C. sections 1964(c) and (d).   It also has diversity of citizenship jurisdiction under 28 U.S.C. section 1332, because Plaintiff is a citizen of Texas, Defendant Cabela's Outdoor Adventures, Inc. is a Nebraska corporation with its principal place of business in Nebraska, and Defendant Burchell is a citizen or subject of a foreign state, namely South Africa.   The amount in controversy exceeds the $75,000 minimum jurisdictional amount for a diversity of citizenship claim.   This court also has jurisdictional authority

over the supplemental state law claim for intentional infliction of emotional distress, under 28 U.S.C. section 1367.  That claim is substantially related to the facts and some of the law pertaining to the federal claims, but prays for personal injury damages not recoverable under the civil RICO law.  Personal jurisdiction will lie in this Court, as the Defendant COA is a domestic corporation, with its principal place of business in this state.  It does millions of dollars of business here, and may be served here.  The Defendant Burchell, though a resident of South Africa, has for ten or so years been doing a majority of his safari business with and through COA, both in person in Nebraska and by communications with COA, including many written and oral communications on the very matters from which these claims arose.  For personal jurisdictional purposes, he has had more than the constitutionally required minimum contacts and has been doing substantial business in this state related to the claims set forth.  Venue is properly set in this District under 28 U.S.C. section 1391 (a),(b) and (c).

### III. Parties

8.      Plaintiff is a citizen and resident of the State of Texas.

9.      Defendant COA is a Nebraska corporation and its principal place of business is in Sidney, Nebraska.  Its core business is the worldwide solicitation, advertisement, and sale of hunting, fishing, and other recreational trips or "safaris" along with related business involving travel booking and recreation related real estate.  COA and its parent corporation, Cabela's Incorporated, advertise widely as "The World's Foremost Outfitter."  COA is

{1323580.1}                                    8

wholly owned by Cabela's Incorporated, a Delaware corporation, which also has its principal place of business in Sidney, Nebraska. Certain of Cabela's Incorporated's employees, including some officers and members of its legal department, participated in and knew about some of the COA acts and omissions complained of in this suit. Cabela's Incorporated is not at this time, however, made a party defendant. The portion of Defendants' patterns of unlawful conduct aimed directly against Plaintiff was intended to preserve the profitable mutual enterprise of Defendants from exposure of unethical and unlawful acts.

10.     Defendant Burchell is a resident and citizen of South Africa. He is a business owner living in or near Alicedale, Eastern Cape Province of South Africa. On information and belief, he is the sole owner of his businesses. He owns and operates hunting properties in South Africa and Namibia and sells hunting trips and related services and products, mostly in conjunction with COA. He operates his "outfitter" or hunting trip business or has operated it under different names, including Frontier Safaris and Burchell Game Reserve. He has also operated in South Africa a taxidermy business under various names. It prepares trophies from the game shot by Burchell's customers or others, and is involved in arranging export documentation for shipment of the trophies to other countries.

### IV. Facts

11.     **Detailed Facts Alleged on Information and Belief or Personal Knowledge.** Plaintiff's allegations of fact are unusually detailed,

despite FRCP Rule 8(a)'s stricture about a short and plain statement of claims, because the RICO case law has demanded highly detailed allegations of fact for Rule 12 purposes on several prerequisite issues and elements. The definition and description of the enterprise, the pattern of unlawful conduct in terms of predicate acts, the engagement of the enterprise in interstate or international commerce, the relationship of damages to the predicate acts, and even the basis for allegations on information and belief must be set out in detail. The facts are alleged on information and belief except for those identified as the direct personal knowledge of the Plaintiff. The Plaintiff's belief is not speculative. Rather, it was formed by collection and comparison of the following sources of information, including some of the details that were obtained from these sources:

a.    The customer booking files provided to Plaintiff's counsel by the Defendants Burchell and COA in court ordered discovery incident to the South Africa litigation referred to in paragraph 4 of this complaint. These records reflect business of the enterprise, dating approximately from 2002 to the spring or early summer of 2010. Plaintiff does not know whether these are complete in the sense of covering all the Defendants' documentation as to COA-Burchell customers throughout those years but to Plaintiff's knowledge, based on comparing items received from COA with items previously received from Burchell's South African counsel, they do not appear to be. These file materials contain information such as:

(1)   where and when the purchased hunting trip was
to take place;

(2)   with what professional hunter;

(3)   arrangements for permits for the importation of
rifles into the country where the hunt is
planned to occur;

(4)   the prices and terms of payment;

(5)   the names and addresses of the participating
hunters and observers;

(6)   sometimes changes of dates or changes in the
identification of hunters purchasing the
hunts;

(7)   "disclaimers" signed by customers purporting to
relieve COA from various duties and
liabilities;

(8)   travel arrangements;

(9)   in some cases post-trip feedback letters from the
hunters reflecting their criticism or approval
of various aspects of the hunting trip and
trophies obtained;

(10) pricing information;

(11)    invoices for the trips and related items or
services; some of the invoice materials include

indication that COA assisted in billing and collecting what was labeled by Burchell as South African "VAT" or value added tax, even though in many instances this was unlawfully imposed by the enterprise on purchases paid for in the United States for which no VAT tax was owed, or for other services not taxable under the laws of South Africa, such as taxidermy work for export to the United States. These details in the records show COA collaborated and assisted Burchell in collecting taxes that were never owed or properly taxable. On information and belief based on a South African expert witness retained for Plaintiff and a statement from Burchell's former spouse, it appears that Burchell did not turn in to the South African Revenue Service these illegally collected amounts, but rather kept them as added profit. His former spouse Kristen testified in a recorded statement that he began adding unlawful VAT tax at a time when he wanted to make up for profit reductions related to money exchange rate changes.  COA also charged some customers an additional 2.5 percent for handling their financing

of the trips by a deposit of funds with COA. As a result, COA shared to that extent in the profiting by the enterprise from the unlawful tax charges to the customers, through adding that service charge for handling or escrowing the funding for the costs of the trip, taxidermy, and other charges;

(12)   an identifying number assigned to each "booking file;

(13)   various communications between the customers and both the defendant companies by email, and by telephone.   Plaintiff alleges that in the numerous situations where these customers were defrauded by the enterprise or placed in jeopardy of lawbreaking for illegal hunting or transportation of trophies, the communications sent by Defendants constitute violations of the wire fraud prohibition of 18 U.S.C. section 1343, even though these communications in themselves do not in all cases contain the false representations which are fraudulent, or which were relied on to the customer's or others loss. Rather, all of them contributed to the pattern of

fraud and deception by the enterprise, in keeping up the flow of customers for Burchell's illegal operations.

b.   Review of the available South African provincial government's file of official hunting registers regarding Burchell hunts. The hunting registers constitute the key documentation legally required for hunters, who are supposed to sign them, to obtain trophy export permits from South Africa to the United States. These official records were obtained by court discovery order in the litigation in South Africa's High Court between Burchell and Anglin; when compared with the COA booking file information, many discrepancies of fact appear, and they amount to violations of the laws of this country and of South Africa's.

c.   Additional records of the government of South Africa's Eastern Cape Province, showing the existence and for some periods non-existence of Burchell's Certificate of Adequate Enclosure (CAE). Those certificates are mandatory under South African laws as detailed in paragraph 17 of this complaint. They serve in effect as the hunters' and outfitter's only license or permit for hunting game animals on such authorized areas of land. Any animals taken on that land without a valid, current CAE are deemed illegally taken and their taking subjects the involved persons to confiscation of the animals and substantial civil and criminal penalties. The records indicate no such CAE was in force for Burchell's property for two periods when he was nevertheless through COA selling and providing for hunting on that land.

These records, according to an affidavit provided to Plaintiff by the Regional
Manager of the Department of Economic Development and Environment Affairs
of the Eastern Cape Province of the Republic of South Africa, indicate that for
the periods of 5/5/2002 to 4/1/2003 and from 5/28/2008 to 5/12/2009,
Burchell did not possess a valid CAE for his hunting grounds, and therefore
any hunting on that land during those periods was unlawful and without
license or valid permit from the Department.    The killing itself and any
subsequent transport or export of those animal trophies was unlawful, both
locally and internationally.

      d.    <u>Inferences drawn by Plaintiff from multiple communications
and conferences Plaintiff has had since approximately 2005 with various South
African and United States governmental investigators, at those investigators'
request.</u>  He has unavoidably learned to some extent what potential law
violations or wrongful acts they seemed to be considering or investigating, in
regard to various Burchell-COA transactions, hunts and documentation.  It is
Plaintiff's belief that such investigations may be centered on the legality or
illegality of the hunting and the transportation of animals and trophies,
including export and import between countries.  On information and belief,
these may include investigations for suspicion of civil or criminal violations of
the Lacey Act of the United States regarding the illegal killing without valid
license or permit, transportation, exportation or importation of what by
international convention are deemed "protected" and in some cases
"endangered" wild animals and trophies, and for suspicion of civil or criminal

violation of numerous hunting and export-import statutes and regulations under South Africa's and Namibia's laws.   Plaintiff does not know whether or not other persons or companies besides Burchell are targets of those inquiries or investigations, or what government action will result.

    e. <u>Information received by Plaintiff from non-governmental sources in South Africa, that one or more of the licensed professional hunters hired and utilized by Burchell may now have disclosed illegal actions they took under employment related duress from him.</u>   Those acts may, if the source's information is correct, include misrepresentations as to where game was unlawfully taken, namely on land not owned by Burchell and without the required written permission from the actual owners, and also with regard to false or incorrect information or signatures on hunting registers submitted by or for the enterprise.   The hunters themselves are supposed to sign and verify their hunting registers.   But in fact, routinely the enterprise, and usually Burchell or his staff acting on his instruction, fraudulently filled them out and falsified the hunters' or other signatures and other information as support for obtaining export permits for the trophies.

    f. <u>The testimony by depositions taken in September, 2010,</u> in behalf of Plaintiff in assistance to the proceedings in the High Court in South Africa, from the chief officer of COA, Gregg Severinson, and two other COA employees, Ed Beattie and Jennifer Estrada.   Those three depositions were obtained by applying for and receiving a court order from United States Magistrate Judge Cheryl Zwart, of the United States District Court of Nebraska,

and were taken in Sidney, Nebraska several months of resistance by the current Defendant COA.   COA objected repeatedly to this court that the gathering of such documents would be unjustifiably burdensome, expensive and time consuming, while knowing at the time that in fact it had already gathered and delivered copies of nearly all of the same requested documents in response to a U.S. Fish and Wildlife Service investigators' request or subpoena. Burchell was given notice of these Nebraska federal court discovery proceedings by Plaintiff, in compliance with this court's orders regarding notice, and also by the United States Magistrate who handled the latter stage of the proceedings, but Burchell did not appear in the proceedings in any way, until just a few hours before the depositions when one of his several South African lawyers objected by email to the taking of the depositions entirely.  In his deposition, under oath, the deponent Severinson admitted that Burchell in claiming a two year shut off of business from COA had lied, and if under oath that it was perjury.  He also agreed that some sample South African hunting registers shown him with regard to his own and other COA employees' own hunts, were incorrect and contained false signatures or other information.  The deponent Beattie admitted to receiving email from Burchell's company that indicated an illegal attempt by to export animal trophy material from South Africa to an American COA customer, the initials of whom are J.F., under a false pretext of it being mere curios or gifts.  Beattie admitted that he saw the email, that he knows it was improper, and mistakenly did not do anything to discourage or prevent this plan for illegal importation.

g.     <u>Extensive investigation performed by and for the Plaintiff in</u> <u>order to prove his defamation defenses.</u>  The work included gathering evidence of the substantial truth in all essential particulars of the allegedly defamatory allegations or statements that were the subject of Burchell's defamation claim. These were matters that Plaintiff and his nephew, Strickland, raised in late January and early February 2005 to COA.  The work also included gathering proof of the complete falsity of the claimed reputation damage by showing that there was no genuine reputation damage in the eyes of COA, and no genuine cutoff of business from COA occurred either.

12.   **The Association-in-Fact RICO Enterprise**.   Each Defendant contributed to and controlled the conduct of a jointly controlled RICO "enterprise" under 18 U.S.C. section 1962.   The-association-in-fact enterprise jointly operated by the two Defendants, while having little formal structure, has existed for many years, at least from 2002 to the early part of 2010.   It did have some loose structure, some division of functions or responsibilities, and goals independent of, though related to the pattern of racketeering conduct, including the underlying illegal hunting sales operations of the enterprise and the defensive racketeering activity described in this complaint, meaning the intimidation and retaliation aimed at Plaintiff to silence him, and the wire and mail fraud incident to that effort.

13.   Consistent with the testimony under oath of COA chief officer Gregg Severinson, the defendants since at least the year 2000 or possibly longer have acted together to promote the cooperative enterprise to the

public.   They have widely advertised by COA or Cabela's catalogs, by joint participation in promotional booths at hunting or safari conventions, by jointly producing and arranging for broadcast of several televised hunting shows shot and recorded at Burchell's land, and otherwise.   They solicited and sold hundreds of customers hunting trips guided by Frontier Safaris, Burchell's company operating in South Africa and Namibia.   The records in possession of Plaintiff indicate at least 493 customer participants since 2002 and those records are believed still to be incomplete.   COA profited mainly by taking a percentage of the price of the trips, but also by obtaining commissions for selling the hunters and guests their travel arrangements, by fronting the accounts or payments from the customers in exchange for an additional percentage or commission paid out of the total price paid, and by receiving discounted or free or "complimentary" safari trips from Burchell for COA or Cabela's officers and employees.

14.    The two Defendants have governed the enterprise informally. Despite court orders to produce their contractual agreements, neither has produced written contracts governing their decade long association, except for COA's providing a copy of two written contracts between them governing two specific transactions in June and November of 2007.   These were prepared when COA paid Burchell in advance for large blocks of 20 or more so-called "prepaid" safari trips.   COA then sold these as if from inventory, and generally took a larger percentage in compensation than it otherwise would receive. These two written form contracts were prepared by COA and apparently signed

by Defendants. But as for the several hundred other collaborative sales of hunts, both before and after the "prepaid hunt" contracts, there has been provided no written contract or other governing document. The government or management of the enterprise has been by general discussions, understandings, implied terms or negotiations, all undocumented. Plaintiff is advised that COA has at times characterized itself as no more than an agent of a principal, Burchell. But the actual relationship history appears similar to an oral or informal partnership, with each member having authority to control conduct, with various negotiated profit splitting, and some mixing of the various functions such as customer accounts, collection, invoicing, and changing details of services or functions through informal adjustments.

15. The informal arrangements governing this decade long association-in-fact enterprise, aside from the two limited written agreements, on information and belief, at one time or another included these other terms, responsibilities and de facto structure:

a. COA appears to have received from 15% up to something like 30% or more at various times for its share of the total price charged to the customers.

b. COA provided the principal advertising and sales efforts for the majority of such safari trips on Burchell's game reserves or farms in South Africa and Namibia.

c. Burchell provided the premises, guides, professional hunters, lodging, food, hunting lands, arrangements for transportation of the

hunters and trophies, and the game animals in both South Africa and Namibia. On information and belief, he sometimes provided the hunts on property he did not own and without the legally required written permission from the owner or other authorized persons.

d.   He also sold to the enterprise's customers, various supplemental services, particularly taxidermy work, for extra money, with respect to the game animals taken by the customers.

e.   When customers shot animals not already paid for in the package price, Burchell charged them separately for those and it is not certain or clear to Plaintiff whether COA received any direct share of that income or not.  If COA was holding the client's funds in an account, COA appears likely to have charged its extra 2.5 percent for collecting the money and sending it to Burchell, and on information and belief, that would include charges related to extra animals harvested.

f.   When extra animals were prepared as trophies and shipped back to America, Burchell charged the customers for those animals and services using a list of base prices.

g.   Burchell sometimes provided a version of his taxidermy or other added costs invoice to COA; he added VAT tax, which as to the taxidermy was an illegal addition.  Sometimes he added a straight 14%, and sometimes he added 14% but only on a portion of the charge.  COA when it received these invoices on Burchell's forms then put the information on its own COA form but included the VAT tax in the total to be charged.  In some cases it did not

itemize the VAT tax addition, but nevertheless included it in the total.  COA would then send such invoices to the customers including the amount for the illegally added VAT, even though COA had been advised that it was illegally added.   COA also would, in some cases, profit specifically even from the illegally collected VAT by adding 2.5 percent on to the total invoice for itself for the service of collecting the invoice from funds of the customer held in account at COA.

h.   Other details of the enterprise's foundational terms have been, at various times, some vague, unwritten sort of a heavily advertised "exclusive" right of COA to sell certain "packages" of game animals, such as ten, at a certain alleged bargain price, to be hunted and killed at Burchell's. COA vigorously advertised it as a "smokin' hot" deal or description to that effect.

i. Prices and other terms of the relationship varied, and were adjusted without any systematic documentation by conversations or emails between the two Defendant entities in the enterprise.

j. Each conducted and controlled aspects of the enterprise's business, including such items as relationships with the customers canceling, customer complaints, allowance or disallowance of refunds upon cancellation, price negotiations, the pricing for killing extra animals outside the ten animal package, arrangements for the intercontinental and local travel and accommodations, and other details.

k.      They also shared the task of creating and supplying legal documentation to obtain import permits for customers' rifles.   There is some evidence that COA may have routinely prepared so called "invitation letters" describing the guns and ammunition to be shipped into South Africa, for the enterprise's customers, and signed Burchell's name with a facsimile signing device or possibly a photocopied signature on that legally required documentation for importation of weapons.   It was by South African law supposed to be an original signed invitation from the designated professional hunter or outfitter in Africa.   The current, relevant law is the Republic of South Africa's Firearms Control Act No. 2000, Act No. 60 of 2000, sections 73 to 79, along with the official regulations entitled "The Firearms Control Regulations of 2004" which contain more specific guidance and law.   These, together with the official application forms and instructions, require as supporting documentation an original of a signed Invitation Letter for a foreign visitor' firearms import-export permit, with the signature to be that of the outfitter or professional hunter who is providing the hunt.   Plaintiff cannot yet determine whether this procedure using facsimile signatures of Burchell was handled lawfully, pending discovery.   It appears not.

l.      COA sometimes visited Burchell's operation and consistently claimed to have monitored the quality and suitability of its outfitter's services, so that customers would believe they could rely on Burchell.

m. COA occasionally made requests for changes or improvements, but until the very end of the relationship, to the best of Plaintiff's knowledge, did not seek to stop any of the hundred of illegal acts and omissions in the enterprise's operation which are described in this complaint.

n. Control of the enterprise was joint, generally collaborative, and informal. Burchell was generally supposed to obtain necessary hunting authority, permits or permissions, and arrange for legal import-export documents for trophies taken or transported between countries. COA learned or was told repeatedly that Burchell was not operating legally, from 2005 or earlier, but took no corrective action.

o. As referred to earlier, Plaintiff has been advised that COA has claimed only to be an agent for its principal, Burchell; but their operation was similar to an informal partnership, with the two members jointly controlling conduct and dividing profits of the enterprise. Plaintiff further alleges that to the extent COA acted as an agent, it was aware of some or all of the misconduct of its purported "principal" at least in 2005 if not earlier, and was sufficiently on notice of the legal and ethical wrongdoing that it is nevertheless jointly responsible for the enterprise's wrongdoing and any consequent injuries for which the law provides a remedy. This is particularly the case where COA continuously sent their mutual customers into the illegal Burchell operations for years after learning of improprieties and unlawful acts. Plaintiff also alleges conspiracy between the two defendants, as to the wrongs

done to him, and co-conspirators are liable civilly for each other's wrongful acts within the conspiracy.

16. **Enterprise Separate from the Pattern of Racketeering Conduct.** The legitimate purpose of the enterprise was to make profits for each member by selling hunts and additional related items. It did that. But in reality the operation and practices were also replete with illegalities as detailed in paragraphs 15 through 20, including subparts, of this complaint. Some of the offenses were known to both members and some were conducted and best known to Burchell. These included a variety of illegal hunting and transporting activity harmful to the interests of the customers, the environmental agencies and authorities here and in South Africa, the taxing authority in South Africa, and ultimately also against Plaintiff as is further specified in this complaint. The jointly obtained customers, including Plaintiff in 2002, were cheated routinely with regard to illegal VAT charges. More important in terms of financial and legal risk, they were also cheated and have been or may in the future be injured by the two enterprise Defendants in that their trophies and the benefit of their safari bargains with the enterprise were placed in legal jeopardy or already have been lost. In hundreds of instances, in many or most cases because of violations unknown to them, their trophy animals were illegally taken and then fraudulently documented by the enterprise for the sake of illegal trafficking in obtaining import, export and other transport permits. Even now a number of the trophies are being held by authorities or already have been confiscated due to the growing discovery of these illegalities.

Hundreds more such items are potentially subject or vulnerable to confiscation by the authorities on both continents, and to plaintiff it seems likely there will be charges or indictments, at the minimum, for illegal importation under falsified documentation.   Both members of the enterprise bear and share responsibility for these legal violations and problems. COA continued its feeder role, despite multiple, documented warnings from Plaintiff and at least some complaints from others about illegalities, before they finally suspended dealings with Burchell just this last spring, 2010, when the investigations became too obviously focused and dangerous.   At that time, in approximately March of 2010, COA, after a months-long series of troubled, anxious email communications both internally and also sometimes including Burchell, finally called a halt to the joint operations of the enterprise, at least until the legal problems all cleared up.  But notably COA did not foreclose starting it up again in the future with Burchell if or when the problems were resolved, and so advised him.  The enterprise had an independent existence, indeed a legal goal of profit for two entities, but it was operated through illegal conduct controlled or controllable by either of the two members.

## V.  The Pattern of Racketeering Activity

17.    The underlying offenses in the pattern of Racketeering activity are a multiyear pattern of illegal hunting and transporting of wild, protected and endangered animals, along with illegally collecting VAT tax.  Plaintiff himself was a hunter in 2002 and 2003 subjected personally to several of these offenses, and when he learned of the illegalities he took the information to

authorities on both continents, and several of those have been investigating vigorously since then. As a citizen assisting in enforcement he is within the core situation intended to be encouraged and protected by the civil RICO laws.

18.    The enterprise's offenses were continuously protected from discovery by law enforcement authorities, through various means of concealment, including falsification of names on documents, falsification of dates of hunts, falsification of place where animals were killed, doctoring of invoices to conceal unlawful addition of VAT taxes, intimidation of witnesses such as professional hunters who were forced to falsify information or lose jobs, and especially including the offenses and conduct aimed at silencing Plaintiff. At some point in the last eight years, the illegal hunting related procedures became the standard set of operating procedures for the enterprise. The activity includes multiple acts of wire fraud and mail fraud in violation of 18 U.S.C. sections 1341 and 1343, all in support of the variety of illegal and fraudulent conduct related to profit making for the hunting business enterprise and concealment of the illegal acts.

19.    Details of the offenses, starting with a list of the laws broken, follow. The enterprise has operated its business between 2002 and the present in a manner that violated the following laws of the United States, the Republic of South Africa, and the Republic of Namibia.

a.        **United States:  The Lacey Act of 1900, as amended in 2008, 16 U.S.C. sections 3371 to 3378, 95 Stat. 1073.** It provides in some of the pertinent parts:

Section 3372.  Prohibited acts

**(a)  Offenses other than marking offenses**

It is unlawful for any person—

(1) to import, export, transport, sell, receive, acquire, or purchase any . . . wildlife . . . taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States. . . .

(2) to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce—

    (A) any . . . wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law; . . .

    (B) any prohibited wildlife species . . .

\*\*\*

**(d) False labeling offenses**

It is unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any . . ., wildlife . . . which has been, or is intended to be—

(1) imported, exported, transported, sold, purchased, or received  from any foreign country; or

(2)  transported in interstate or foreign commerce.

Section 3373.  Penalties and sanctions

**(a) Civil penalties**

(1) Any person who engages in conduct prohibited by any provision of this chapter . . . and in the exercise of due care should know that the . . .wildlife or . . . were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying law, treaty, or regulation . . .may be assessed a civil penalty by the Secretary of not more than $10,000 for each such violation . . . .

\* \* \*

**(d) Criminal penalties**

(1) Any person who—

    (A) knowingly imports or exports any . . . wildlife . . . in violation of any provision of this chapter . . ., or

    (B) violates any provision of this chapter. . .by knowingly engaging in conduct that involves the sale or purchase of, the offer of sale or purchase of, or the intent to sell or purchase, . . . wildlife . . . with a market value in excess of $350, knowing that the . . .wildlife . . . were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying

law, treaty or regulation, shall be fined not more
than $20,000, or imprisoned for not more than
five years, or both. . . .

Section 3371 provides definitions; section 3374 provides for
forfeiture of illegally taken or transported or exported or
imported wildlife; section 3375 provides for enforcement
powers.

**(b)    Republic of South Africa.** The current version of the
key national statute is the National Environmental
Management: Biodiversity Act, 2004, Act 10 of 2004. It is
enforced nationally under regulations entitled "Threatened or
Protected Species Regulations 2007" published in
Government Gazette No. 29657, Government Notice No.
R152 of 23 February 2007. Enforcement of these laws,
along with closely corresponding Provincial laws, is largely
delegated to the Provincial Government Departments, in this
case the Department of Economic Development and
Environmental Affairs of the Province of the Eastern Cape.
Lesser violations are punished by a list of fines, and many
more serious ones are enforced by penalties of
imprisonment. The Provincial Nature and Environmental
Conservation Ordinance No. 19 of 1974 as amended
prohibits hunting of protected wild animals without a valid

license or permit in the hunter's possession (Ordinance, Part IV, paragraph 27); it allows as a substitute for such individual license or permit, however, hunting for such protected wild animals in the presence of the owner or with his or her written permission in possession, on land covered by a valid Certificate of Adequate Enclosure (Part IV, paragraphs 35 – 39); possession (paragraph 42) and transporting, importing or exporting any wild animal without a valid permit are prohibited (paragraph 44). Falsification of documents required for the lawful performance of any of the acts in the ordinance is prohibited in paragraph 85. The extensive list of violations and fines if the matter is disposed of on an admission of guilt was offered as exhibit 114 in the Gregg Severinson deposition referred to previously in this complaint. details more types of violations. Offenses on that document with no fine listed upon admission of guilt, cannot be resolved in that way and there are potential prison sentences for those offenses. In addition, the enterprise has violated the VAT tax laws by fraudulently collecting and keeping VAT taxes from customers, as detailed earlier in this complaint at paragraph 11 a (11).

(c)     **Republic of Namibia.** The primary relevant law is the Nature Conservation General Amendment Act, 1990. It is

published in the Government Gazette of the Republic of Namibia, No. 133, 31 December 1990. It amends section 20 of the Nature Conservation Ordinance of 1975. Section (2) provides penalties for offenses up to 200,000 Rand or imprisonment up to 20 years for the most serious offenses for illegally hunting certain animals, such as elephants and rhinoceros; it provides for up to 20,000 Rand or imprisonment up to five years or both for offenses related to the hunting of any other specially protected game; or 16,000 Rand or four years or both for offenses relating to other game. One of the significant provisions is section 5 which makes it an offense penalized up to 200,000 Rand and or twenty years imprisonment for illegal import, export, possession, or dealing in any controlled game product not in accordance with a valid permit. That would include taking killed animals across the border of the country and to South Africa for taxidermy work, without an export permit. This provision was violated frequently by the enterprise.

20.   **The particulars of Defendants' conduct in regard to this pattern of racketeering include hundreds of separate violations**. Rather than try to relate each them individually four charts, **Attachment Lists A, B, C, and D,** are attached to the complaint and incorporated here. Specific potential, probable cases of the enterprise and its customers' probable law

violations are set forth in the four lists. **List A** shows COA-Burchell customer hunters who hunted in South Africa. **List B** shows such customers who hunted on land in South Africa owned by Burchell, but at a time when he had no Certificate of Adequate Enclosure for that land, and therefore the hunting was without a permit or license. **List C** shows customers who hunted in Namibia, and for the most part, subjected to illegal import-export of their trophies to South Africa and then on to the United States. **List D** shows COA or Cabela's employees, officers, and other Cabela's connected persons who hunted with Burchell's company, and in almost every case were subjects of law violation as to their hunting, their export of trophies to the United States, as to VAT taxes, or more than one of those kinds of offenses.   On information and belief as explained in paragraph 10, all or at least a majority of the clients listed on each of the four attachments are presently provable victims or subjects of the enterprise's pattern of lawbreaking conduct.   The key to the captions across the top of the lists is as follows:  the top caption describes the overall content of the list. The column captions are as follows.  The Clients of the enterprise are referred to first by a "Ref#" (reference number) keyed to a master list of 493 named customers about which Plaintiff has some or all of the Booking file and hunting register information.  That master list with customers' full names is not attached but is readily available to Defendants on request. The second column gives the last and then first initials of the clients.  The next column, headed "Booking #" gives the COA booking file number referable to that client.  The next column gives the "Date of Scheduled Hunt", taken from

the booking file information.  The next column refers to the "Location" of the hunt that was shown in the booking file Plaintiff alleges that as to each of those for whom a violation is listed, the Defendants are legally responsible for the referenced violations, and Plaintiff does not know or allege that any of the clients themselves violated the law, knowingly or otherwise.  Plaintiff has enough documentation to be sure that a majority of each list of hunters were subjected to one or more of the illegal practices, and upon further discovery will be able to refine the lists, excluding those for whom no evidence shows a violation as to his or her hunt, and detailing as to each hunter just which offenses were committed.   Further document discovery and deposition work in this case will be needed to confirm with certainty all the details of these instances of potential violations, to confirm the details of any law violations, and the number and kind of trophy animals illegally taken by these client hunters, and the amounts of illegal taxes, due to the enterprise's illegal procedures, acts and omissions.

21.    The following subparagraphs provide details of the alleged wrongdoing by Defendants constituting the pattern of illegal conduct and predicate acts, with references to the attached charted lists.

a.    In their advertising and specific sales pitches to customers, the Defendants  misrepresented to them that they were buying valid and legal hunting trips, and implied or stated that their trophies would be lawfully hunted and could be lawfully transported to them in the United States.  The procedures used for the wild animal hunting and trophy preparation and

transport were fraught with crimes under United States, South African, and Namibian hunting, conservation and export-import statutes and regulations, as listed in the previous paragraph. This misleading of the customers took place despite the COA's advertised assurances that it thoroughly monitored, checked out and endorsed the quality of its associated outfitters, namely in this case, Burchell.

      b.    <u>The enterprise since at least 2002, and through at least March of 2010 has been knowingly, continuously and regularly violating the game regulatory laws of the two host countries, South Africa and Namibia, as well as violating the United States' primary law regulating the taking and transportation of game, the Lacey Act, 16 U.S.C. sections 3371 to 3378.</u> The Lacey Act incorporates by reference and also enforces foreign countries' laws on the harvesting and transportation, or trafficking, of protected plants and wild animals and including game trophies. Each animal illegally taken or transported, including the importation or exportation of trophies created from such animals, constitutes a separate offense under these referenced laws. **Attachment List A** is appended to this complaint and incorporated as part of this paragraph. It lists some two hundred eighty-one (281) Cabela's Outdoor Adventure-Burchell clients who hunted in South Africa, the majority of whom are believed to have been subjects or unknowing victims of illegal hunting procedures and illegal transporting of trophies under the South African statutes and regulations described above, due to dishonest acts of the enterprise. This list among other situations includes cases in which there was

hunting by the listed client on land not owned by Burchell and without the required written permission from the owner, and then false representations made by or for Burchell about the place of the hunt in order to obtain export permits.   The violations pertaining to this list, especially those having to do with fraudulently obtained export permits, also are violations of the Lacey Act, 18 U.S.C. section 3372(a)(2)(A), with its incorporation of foreign law violations.

      c.   <u>The enterprise has engaged in, and led clients to engage in, illegal hunting and killing of animals without the Defendant Burchell having the required Certificate of Adequate Enclosure (known as the "C.A.E.") for his land where hunting and harvesting of animals occurred, in violation of the South African Ordinance previously detailed. at Part IV, paragraphs 35 and following.</u>   The Provincial Government of the Eastern Cape has disclosed its records showing that Burchell's land that was used for hunting by the enterprise, and specifically by Frontier Safaris in South Africa, had no valid C.A.E. for the periods May 5, 2002 through April 1, 2003; and May 28, 2008 through May 12, 2009.   **Attachment List B** is appended to this complaint and incorporated, and it lists thirty-six (36) Cabela's Outdoor Adventures-Burchell clients who hunted with the Frontier Safaris operation during that latter period when there was no certificate, hence no legal permit or license for hunting on that property.   Plaintiff has insufficient information so far to determine violations during the earlier period.   Again, as to each animal involved, these violations also were Lacey Act violations.

d.  <u>Illegal transportation of wildlife, protected or</u>
<u>endangered wildlife and trophies made from them, by the Defendants in behalf</u>
<u>of numerous of their customers acting in reliance on the Defendants, of the</u>
<u>bodies, skins, or parts of animals killed as trophies, from Namibia to South</u>
<u>African without valid permits for such transportation,</u> in violation of section 5
of the Namibian statute cited above in paragraph17(c).  It is also believed that
those Namibian hunts which later resulted in shipments of trophies from
Burchell's South Africa taxidermy business, came to the United States under
fraudulently obtained South African export permits, with the representation on
the applications that the animals were taken in South Africa on Burchell's
premises.  **Attachment List C** is appended to this complaint and incorporated
here with this paragraph, and it lists seventy-two (72) Cabela's Outdoor
Adventures-Burchell clients who hunted in Namibia, and on information and
belief, all or most of these trips included violations of those Namibian and
South African laws and also the Lacey Act section 3372(a)(2)(A).

e.  <u>Illegally submitted, incorrect, and in many instances</u>
<u>intentionally forged entries and signatures on South African hunting registers,</u>
which registers serve as a mandatory part of the application forms for permits
to export trophies or animal skins to the United States, in violation of the
South African and provincial regulations, specifically section 85 of the Nature
and Environmental Conservation Ordinance, concerning falsified documents as
to permit applications.  Each illegally documented trophy may represent a
separate offense, several hundred in total.  Hunters whose hunts in South

Africa included one or more of these offenses are a majority of the 281 included in the list of hunters on **Attachment List A.** Plaintiff has enough documentary information at this time to show violations with respect to more than half, and given some discovery will be able to document more hunters subjected to the illegal conduct, as well as those who were not.

     f.   <u>Illegal transportation of customers' trophies or animal parts to be made into trophies, by fraudulently exporting them from South Africa to the United States under a pretext or false representation that they are gifts or curios rather than animal trophy materials, in violation of South African export permit requirements and of the Lacey Act, 3372 (d)(1) and (2).</u> This occurred with reference to customer J.F. and is known from COA's records to be part of the U.S. Fish and Wildlife Service investigation in 2009 and 2010. Electronic communications, namely emails, between the Defendant Burchell and the client, with copy to Mr. Beattie of the Defendant COA, were used to facilitate and enable this violation of law.

     g.   <u>COA officers, employees, persons preparing promotional articles about the COA-Burchell hunts, and other persons closely connected to COA hunted with Burchell, and on information and belief, each of these participated in one or more of the hunting procedures which violated the laws of the African countries and also of the United States</u> in one or more of the ways already described previously. They were for the most part representatives of the world's self-described leading outfitter, they were hunters with plenty of knowledge that they had to hunt with valid permits in possession, and had

more than enough experience and knowledge of hunting laws to know they were themselves in violation of laws regulating hunting and transporting their trophy animals.  Also, they knew or had every opportunity to know that the animals they exported, often directly to Cabela's headquarters address in Sidney, Nebraska, were in fact illegally exported from South Africa and imported to the United States. Plaintiff does not have knowledge as to whether these trophies are part of the Cabela's stores displays, or are in possession of the hunters themselves at this time.  These Cabela's related persons are listed in **Attachment List D**, incorporated here.

        h.    <u>Unlawful imposition of Value Added Taxes on clients of the enterprise as described in detail in paragraph 11a(11) and elsewhere in this complaint, in violation of South Africa's VAT Act No. 89 of 1991.</u>  The plaintiff himself was unlawfully charged for value added tax (VAT) by the enterprise in 2002.  When he felt he was cheated by Burchell in regard to a real estate transaction in 2003, he began looking into the other practices of Burchell, and among many other things, found that Burchell was illegally adding VAT tax to taxidermy work for export on all or most of his customers.  Plaintiff disclosed this to COA in 2005 and again, with detailed documentation, in 2008, including a witness statement from Burchell's ex-spouse, Kristen, that this was a practice started by Burchell in order to increase his total profit.  An expert witness on the subject opined that it appeared that Burchell's tax collection violated the VAT law, and this information was provided in 2008 to COA.  Yet both Defendants continued with the practice, and COA even helped Burchell

collect the illegal tax item from the clients, and in some cases added another 2.5 per cent to invoices that had unlawful VAT tax in them, as a service charge for handling the account of the client for the trip.

     i.   <u>The practice of COA itself issuing to clients "letters of invitation" which on the surface would appear to have been prepared and signed by the South African outfitter, Barry Burchell, in South Africa.</u> On information and belief based on COA file documents, COA itself appears to have provided some of these letters, and they appear to have been signed using an automatic signing machine or a photocopied or otherwise manufactured signature of Barry Burchell, to support the customers' importation of hunting rifles and their ammunition into South Africa and/or Namibia. The relevant law from South Africa on this subject was set forth in paragraph 15(k), particularly sections 73 to 79 of the Firearms Control Act 2000, and the regulations and forms which implement it. It will be necessary to complete discovery to determine for certain the factual details and whether this apparent "shortcut" violated any law or regulation.

     j.   <u>Human rights abuses by Burchell, known to COA.</u> In addition, the information provided to COA orally and in writing in early 2005 included a DVD of several recorded eyewitness reports as well as some second hand reports of serious human rights abuses by Burchell as to his own employees. These included reports of brutal punishment of Frontier Safaris employees by Burchell and his father, Fred Burchell, and detailed descriptions of oppressive everyday work and living conditions. Plaintiff has insufficient

information to determine whether these constituted violations of South African law, but they demonstrated unethical business practices of the enterprise. When he received it, COA's Director, Mr. Severinson did not view the DVD, indicating that at an hour and a half it was too long for him to take time to view it. Instead he sent the letter right off to Burchell's office, saying that "Let's hope this goes a way soon before we get a bad reputation with the general public over this deal." Shortly thereafter, despite Strickland's letter already having been sent to Burchell, a Cabela's officer, Mike Callahan, wrote Strickland promising confidentiality as to the DVD and any contact information to be supplied. The matter was then turned over to an in-house attorney, Reed Gilmore. After an alleged investigation of Plaintiff's and Strickland's submitted information, and even before one or more phone conversations with Plaintiff giving further details, Mr. Gilmore by May 11, 2005 or earlier concluded to do nothing, according to COA Director Severinson. In June, Gilmore advised Plaintiff and also Burchell that the accusations about the abuses had not been proved or corroborated sufficiently for any action to be taken. Gilmore also told Burchell who the witnesses were for whom he had received the supposedly confidential contact information. COA took no action whatever against COA's enterprise partner as to these concerns or any of the other allegations and issues. Mr. Gilmore never spoke with any of the eyewitnesses. He also apparently left no records of his alleged investigation of Burchell's operations. The only record COA has supplied which apparently was from his investigation was a report he obtained, illegally as far as can be determined at this time,

from the National Crime Information Center showing an old conviction of Plaintiff on a federal firearms offense. If that report was obtained and used for a private purpose of COA and/or Burchell, its acquisition, use and any further distribution of it are in apparent violation of 18 U.S.C. section 641, which prohibits such acts. COA in 2010 again disclosed, and actually distributed this document to the federal investigators, to Burchell, to its outside attorneys and to Plaintiff.

   k. <u>COA excuses Burchell, and Warns Plaintiff Anglin.</u> After COA received the telephonic and written notices of legal, ethical and human rights concerns from Paul Strickland and Plaintiff, and performed at most a perfunctory investigation, on June 6, 2005 attorney Gilmore reported to Burchell that it was warning him against any behavior such as that reported, but told him that it did not have proof or corroboration from first hand witnesses that it really did occur, and therefore was not taking any action. Mr. Gilmore also wrote to Plaintiff on June 7, 2005 with a copy of that favorable determination letter to Burchell, and at the end warned Plaintiff that if he brought the matter to the attention of news media, as Plaintiff may have discussed doing, then Cabela's had already conducted "a thorough inquiry into your background . . . . If your allegations become a matter of public discussion, it would only be fair that your personal background be subject to public scrutiny as well." This threat to retaliate using an illegally obtained old criminal record against Plaintiff if the Burchell allegations became public, was an early part of COA's effort to silence Plaintiff and to keep his knowledge as a

victim, witness and informant about the enterprise covered.  While the public record of the old offense could have legally been discovered, and has in fact no relevance to the issues in this case, COA or Cabela's Incorporated, on information and belief, instead utilized its connections to obtain the FBI's NCIC confidential record.

        1.   <u>Burchell confers with COA, Plans Suit Against Plaintiff.</u> Burchell and his attorneys in South Africa right away in February 2005 discussed with COA a defamation lawsuit against Anglin as a response to his reporting to COA.  On July 1, Burchell's attorney wrote COA stating "Barry will be instituting action against Anglin for payment of damages by reason of Anglin's defamatory statements."  The suit appears to have been filed on July 27, after Burchell had already been informed that the business relationship would continue as before.  Burchell then visited in person in Nebraska with COA Director Gregg Severinson in August of 2005, and there was some discussion of the Anglin problem and, on information and belief, of the Burchell litigation.  Plaintiff alleges on information and belief that the two Defendants made plans as to cooperation in pursuing that suit against Plaintiff at that time and before.  Subsequent actions by COA supported only the Burchell side of that litigation, and particularly the false and fraudulent claim of damages for a two-year cutoff of business, which was absolutely false and known by both Defendants to be false.

        m.   <u>Plaintiff Defends Against the Retaliatory Suit at High Cost.</u> The defamation claim by Burchell as filed in July 2005 was for general

reputation damage in the amount of 1,500,000 Rand.  After 2006 passed, he amended it claiming special damages for 2005 and 2006 for loss of COA business, bringing the total claim up to almost 12,000,000 Rand.  The exchange rate for the South African Rand has fluctuated, but for the last year has been in the range of approximately 7 Rand per U.S. dollar.  The claim is based solely on the communications of wrongdoing by Plaintiff to COA in 2005. Plaintiff has defended himself as well as he could afford since that time, paying for very capable South African attorneys, advocates, expert witnesses, consultants and for substantial investigation and other related costs, all at great injury to his business and property.

        n.  <u>COA Ignores Plaintiffs Requests for Information.</u>   Plaintiff Anglin's attorney, Mr. Brin Brody, sent Mr. Gilmore in an emailed letter dated November 29, 2006, a courteous request that COA provide information about the facts underlying Burchell's defamation and damage claims.  The copy received by COA's attorney now has a handwritten note written at the top of it, "Needs Response—not urgent or important."  This handwriting has not yet been identified, but it was a Cabela's or COA employee's note.  No response whatever was sent by COA or Cabela's or received by Mr. Brody.  Again, in 2007, Plaintiff obtained from a Texas court a document subpoena and it was sent or delivered to COA.  Once again, there was no response whatsoever to the subpoena.  That subpoena from another state may not have been enforceable, but if COA were not aligned so tightly with Burchell, a response of some sort would have been sent.  Finally, in the fall of 2009 and throughout the first

seven months of 2010, as the September trial date for the defamation claim approached, the Plaintiff Anglin sought assistance from this Court, in the form of an application for assistance to a foreign Court's litigation. After many months of resistance on a false representation that it would be too burdensome to gather the documents requested, COA finally admitted it had in fact already gathered the bulk of the requested documents, and more, in responding to a federal subpoena or investigatory request. Upon a stipulation and court order, U.S. Magistrate Judge Honorable Cheryl Zwart presiding, COA and Cabela's turned over some 50,000 documents in no discernible order and without indication of any manner of organization. The electronically compiled stack of 50,000 documents on a compact disc was topped with, as document number 1, the NCIC report on Anglin that COA had obtained back in 2005, probably illegally under 18 U.S.C. section 641. On information and belief, this was another signal, an implicit warning aimed to intimidate Plaintiff with potential reprisal or retaliation if he publicized COA's troubled enterprise relationship with Burchell and their unlawful conduct.

o. COA Aids Burchell As Soon as Asked, Falsely Supports His Claim. In contrast to the stonewalling of Plaintiff, Defendant COA worked to prepare evidence requested from it by Burchell's attorneys, volunteering a factually false and misleading email letter dated October 19 as to limiting new bookings. The letter omitted the fact that there were actually many new bookings notwithstanding the alleged "limit." It omitted the fact that COA booked new business to Burchell's Frontier Safaris in Namibia, instead of his

South African operation, knowing that Burchell owned both.  It omitted also the fact that people who had at some past time hunted with Burchell were another exception.   It omitted to disclose that whatever the purported suspension amounted to, it was definitely over with by early May 2005, and possibly much sooner.  There were new bookings in January, February, March, April, May and June 2005.  The email letter omitted to say that there was no documentation whatever of the supposed suspension, either starting or stopping it.   Severinson in his deposition admitted that he is aware of no documentation to show the alleged suspension of new bookings, nor the financial effect of the purported stoppage either.  In addition, COA promptly furnished Burchell with figures showing gross sales for the years 2005 and 2006 and the years before and after, upon informal request from Burchell's office.  At that time, COA was certainly fully aware that there was no factual basis for the two year time period of his claim of a stoppage of new bookings. At Severinson's deposition in September 2010, he used the various alleged exceptions to explain documents showing numerous bookings all through the time from January 2005 to May 2005, when the alleged "limitation of business" to bookings already ordered and in place, was claimed to be in effect.   In addition, COA's Director, Gregg Severinson, upon being telephoned and requested by Burchell to come testify, tried in 2007 for permission to go to South Africa to assist Burchell at the July 2007 trial session, but he was vetoed by one of his superiors from Cabela's Incorporated, since there was no subpoena.

p.   <u>Reasonable Inference of Collaboration by Defendants.</u>

The contrast of cooperation for Burchell and stonewalling for Anglin by COA in regard to the fraudulent defamation claim supports a reasonable inference that the lawsuit was a joint project, aimed to intimidate, harass, deter and punish Plaintiff for his disclosures to the authorities of the wrongdoing by the enterprise.  Because its purpose was to deter and punish a witness, victim and informant for going to authorities in regard to the illegal and unethical actions of the hunting business of the enterprise, the fraudulent, joint development and maintenance of the lawsuit violated 18 U.S.C. sections 1512 and 1513.   Additionally mail and/or wire fraud violations under 18 U.S.C. 1341 and 1343 were committed in support of the fraudulent lawsuit, as detailed in this paragraph and subparts.

### V.    <u>First Claim</u>: Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. section 1964(c) (participation in conduct of enterprise through racketeering activity)

21.    Plaintiff has standing to bring suit under both 18 U.S.C. sections 1964(c) and (d), and a right to recover for injury to his business and property directly or proximately caused by the Defendants' commission of the specific federal crimes constituting listed predicate acts under 18 U.S.C. section 1962.  The specific actions and conduct in the pattern of racketeering activity are those described in paragraphs 15 through 20 and subparts. Plaintiff makes claim only for his own personal losses and not those of any other client of the enterprise, and not in behalf of any governmental entity.  In this first claim, the predicate acts are Defendants' combined and mutual efforts

at intimidation and retaliation against Plaintiff (a witness, a victim, and an informant) in violation of 18 U.S.C. sections 1512 and 1513, along with use of the mails and/or wire (emails and telephone calls) supporting those actions, all as previously alleged.

22.    The Defendants' acts of racketeering conduct directly and proximately have caused Plaintiff injury to his business and property, namely expenditures reasonably incurred since 2006 to date and reasonably certain to be incurred in the future to defend himself against the intimidation by fraudulent, baseless litigation in South Africa.  These costs include at least the following:  South Africa legal fees and court costs for defense to date, $508,846.15; travel expenses for Plaintiff and witnesses, $85,458; additional professional fees for experts, consultants, investigative services and attorneys reasonably and necessarily employed by Plaintiff in the United States for discovery and other preparation for litigation with Burchell, $225,696.43; estimated losses to Plaintiff's proprietorship hotel construction business due to his distraction and absences from it since July, 2005, at least $376,000.  The total of these losses to his business and property is $1,196,000.58.    The amounts have been incurred or suffered by Plaintiff through present date.  In addition, his necessary absence caused by trying to defend against Defendants' intimidation and punishment through a fraudulent lawsuit thousands of miles away, has removed him for long periods from the management and pursuit of his hotel maintenance, rehabilitation and construction business in San Antonio, Texas, and he is reasonably certain to continue to suffer financial

injury to that business as a result of the unlawful conduct of the Defendants and their enterprise.  This will result in additional losses before time of trial, and Plaintiff will timely amend to so claim.  As of this date, he is entitled to recover from Defendants pursuant to 18 U.S.C. section 1964(c), the amount of $1,196,000.58, trebled by order of this court and with costs including a reasonable attorney's fee.  He prays for that relief.

### VI. Second Claim: Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. section 1964(d) (conspiracy)

23.    Paragraphs 1 to 22 and all subparts are re-alleged here as if fully set forth.

24.    There was a conspiracy between the two Defendants to commit the illegal acts constituting the portions of the pattern of racketeering activity, as described in the previous claim, directed at Plaintiff.  There was, in other words, an agreement to cooperate to silence and suppress Plaintiff Anglin, the witness, victim, and informant.  The formation of the conspiracy in part was by telephone and email communications between the Defendants in February 2005, in June 2005, by personal discussions between them in August 2005, and subsequently in planning for the 2007 portion of the litigation, when Severinson attempted to assist Burchell again. The principal weapons planned for the conspiracy included working together at exposing an old, irrelevant but embarrassing, negative past history of plaintiff, which COA threatened and Burchell did by making statements to the public and press about Anglin; but mostly by the filing and maintenance of the fraudulent lawsuit for alleged defamation in the High Court of South Africa, with Burchell

acting as the nominal plaintiff falsely claiming damages from alleged reputational injury in the eyes of his own "partner" in their enterprise, COA. Such a claim by Burchell could not succeed without joint and coordinated manipulation of evidence, planning, manufactured evidence of reputation damage, financial loss, and other cooperative efforts, along with refusal by COA to provide actual facts to Plaintiff for his defense. Those coordinated plans were made, starting in 2005 and continuing until at least spring of 2010. The conspiracy by Defendants used telephone and emailed communications to advance the intimidation and retaliation against Plaintiff, as referred to in this paragraph and in paragraphs 19 through 21 and subparts.

25. Plaintiff is entitled to damages in the same amount set forth in paragraph 20 for loss of business and property directly caused by Defendants' conspiracy in violation of 18 U.S.C. section 1962(d), namely $1,196,000.58. Under the authority of 18 U.S.C. section 1964(c), any such damages are to be trebled and Plaintiff is to recover costs, including a reasonable attorney's fee, and he prays for that relief. Plaintiff does not ask for these damages in addition to those requested in his first claim, but as an alternative claim for the same damages.

## VI.   Third Claim: Intentional infliction of emotional distress

26. The allegations in all prior paragraphs are re-alleged as though fully set forth.

27. A baseless and fraudulent litigation including a defamation claim was filed against Plaintiff, a Texas resident, in South Africa

{1323580.1}                                    50

by Defendant Burchell after conferring with COA, and it was supported and maintained by collaboration of both Defendants.  The purpose of the suit was to intimidate, deter, discredit and punish Plaintiff for disclosing to the authorities wrongdoing by Burchell, which he and COA knew would potentially hurt their jointly controlled business.  The lawsuit chosen as the weapon against Plaintiff was intended to cause, and did cause, severe emotional and mental distress, and it was intentionally inflicted.  The conduct, particularly because the Defendants knew that the allegedly defamatory material in the litigation was in fact true in all essential respects, and knew that such an intercontinental lawsuit would be extremely difficult and expensive for Plaintiff to defend, and would cause great stress, was extreme and outrageous.  The emotional distress suffered by Plaintiff has been severe and at times disabling. He has sought and received counseling and medical care for the symptoms, and continues to suffer such distress.

28.    Under the applicable law of the State of Texas, where some of the injury to Plaintiff has been inflicted and experienced, the remedy for intentional infliction of emotional distress is monetary damages.  The two claims in this suit for RICO damages cannot reach compensation for personal injury, including emotional distress, and it is his sole remedy.

29.    Plaintiff has necessarily incurred medical expenses for the condition and will do so in the future.

30.    Plaintiff is entitled to and prays for special damages for medical expenses in an amount to be determined and disclosed pursuant to

{1323580.1}                                                    51

discovery rules of this court and the Federal Rules of Civil Procedure, along with general damages for his past and future emotional distress, and for costs.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment for business and property losses on his first claim and on his second claim in the total amount of $1,196,000.58, trebled by order of this Court, plus costs including reasonable attorneys' fees; and on his third claim for special and general damages for emotional distress, past and future, and costs.

**JURY DEMAND:** Plaintiff Demands This Case Be Tried to a Jury.

Scott C. Anglin, Plaintiff

By his Attorney:    _____

Alan E. Peterson
Mayfair Building Suite 103        Nebraska Bar #13295
625 South 14th Street            Phone: 402-435-0008
Lincoln, Nebraska 68508          alanepeterson@gmail.com

## ATTACHMENT:  Lists A, B, C, & D

### LIST A
### Hunts in South Africa, the Majority of Which Included Violations of Export-Import Laws of South Africa and the United States, because Permits Were Obtained with False Documentation, or Hunts Were Without Valid Written Permission if on Non-Burchell Land.  Also, many of these Hunters Were Victims of Unlawful VAT Tax Charges.

| Ref# | Last | First | Booking # | Date |
|------|------|-------|-----------|------|
| 1 | A | J | 16381 | 24 April-1 May 2008 |
| 2 | A | E | 15409 | 15-24 April 2006 |
| 4 | A | G | 14332 | 24 April-3 May 2006 |
| 6 | A | D | 11781 | 5-14 April 2004 |
| 10 | A | B | 14332 | 24 April-3 May 2006 |

| 12 | A | R | 10620 | 08-17 July 2003 |
|---|---|---|---|---|
| 13 | A | L | 17169 | 5-14 june 2007 |
| 14 | A | M | 17169 | 5-14 june 2007 |
| 15 | A | B | 15399 | 10-19 Sep 2006 |
| 16 | A | S | 15399 | 10-19 Sep 2006 |
| 18 | A | J | 18590 | 29 April-12 May 2008 |
| 19 | A | D | 19398 | 20-30 July 2010 |
| 23 | B | M | 18984 | 12-21 July 2010 |
| 24 | B | J | 15155 | 10-19 July 2006 |
| 27 | B | D | 10437 | 08-17 June 2003 |
| 28 | B | R | 11691 | 12-21 May 2003 |
| 30 | B | D | 11244 | 12-21 May 2003 |
| 31 | B | M | 13400 | 2-11 May 2005 |
| 35 | B | T | 12977 | 20-29 April 2006 |
| 36 | B | G | 20237 | 13-22 July 2009 |
| 38 | B | D | 20346 | 26-31 Oct 2009 |
| 39 | B | D | 15784 | 19-28 April 2006 |
| 40 | B | S | 11883 | 11-20 August 2003 |
| 41 | B | D | 10374 | 02-11 June 2003 |
| 42 | B | J | 16561 | 1-10 April 2007 |
| 49 | B | J | 20933 | 26 July-4 August 2010 |
| 50 | B | R | 12184 | 9-18 August 2004 |
| 51 | B | L | 11866 | 24 August 02 Sep 2003 |
| 52 | B | J | 20647 | 6-15 Sep 2010 |
| 53 | B | B | 13373 | 26 June 5 July 2005 |
| 55 | B | G | 16390 | 21-30 May 2007 |
| 56 | B | J | 16043 | 1-10 August 2006 |
| 57 | B | E | 16797 | 19-28 March 2007 |
| 59 | B | R | 21153 | 18-27 July 2010 |
| 60 | B | M | 17234 | 3-12 March 2007 |
| 62 | B | J | 18590 | 28 April-12 May 2008 |

| Ref # | Last | First | Booking # | Date |
|---|---|---|---|---|
| 65 | C | R | 10618 | 14-23 July 2003 |
| 66 | C | G | 11223 | 10-18 Sep 2003 |
| 67 | C | R | 17457 | 25 July-3 August 2007 |
| 69 | C | J | 20498 | 1-10 July 2009 |
| 70 | C | B | 15353 | 17-27 April 2006 |
| 72 | C | D | 20385 | 12-22 July 2010 |
| 73 | C | E | 20803 | 15-24 April 2010 |

| 75 | C | W | 11368 | 08-17 July 2003 |
|----|---|---|-------|------------------|
| 76 | C | D | 13967 | 26 June-5 July 2006 |
| 77 | C | L | 17078 | 22-31 March 2007 |
| 80 | C | J | 19319 | 6-15 June 2009 |
| 83 | C | J | 10095 | 26 June-05 July 2003 |
| 84 | C | R | 10095 | 26 June-05 July 2003 |
| 85 | C | C | 11714 | 22 Sep-01 Oct 2003 |
| 89 | C | G | 20526 | 27 April 6 May 2010 |
| 91 | D | A | 14526 | 9-18 July 2005 |
| 92 | D | D | 11375 | 08-17 July 2003 |
| 93 | D | D | 14526 | 9-18 July 2005 |
| 94 | D | L | 12001 | 19-25 April 2004 |
| 95 | D J | B | 16729 | 5-14 May 2008 |
| 96 | D | T | 12077 | 11-23 June 2005 |
| 97 | D | P | 13118 | 26 July-4 August 2004 |
| 99 | D | D | 13484 | 30 May-8 June 2005 |
| 101 | D | J | 11618 | 20-29 April 2003 |
| 102 | D | C | 20360 | 24 Sep-3 Oct 2009 |
| 103 | D | K | 11112 | 16-25 June 2003 |
| 104 | D | N | 11112 | 16-25 June 2003 |
| 105 | D | E | 16390 | 21-30 May 2007 |
| 106 | D | T | 11884 | 07-20 July 2005 |
| 109 | D | B | 11371 | 19-28 May 2003 |
| 111 | D | B | 20072 | 19-28 May 2009 |
| 113 | D | M | 19913 | 23-27 July 2009 |
| 117 | E | P | 15395 | 5-14 Sep 2006 |
| 120 | E | R | 11629 | 30 June-09 July 2003 |
| 122 | E | T | 13662 | 26 July 04 August 2005 |
| 124 | E | K | 11618 | 20-29 April 2003 |

| Ref # | Last | First | Booking # | Date |
|-------|------|-------|-----------|------|
| 125 | E | S | 11618 | 20-29 April 2003 |
| 126 | E | C | 20498 | 1-10 July 2009 |
| 127 | E | T | 12977 | 20-29 April 2006 |
| 128 | E | L | 20996 | 20-29 july 2010 |
| 129 | E | J | 20639 | 12-21 April 2010 |
| 130 | E | J | 11628 | 14-23 July 2003 |
| 131 | E | C | 10897 | 21-30 August 2003 |
| 132 | E | D | 20202 | 1-10 April 2010 |

| 133 | F | A | 20313 | 2-11 April 2010 |
|---|---|---|---|---|
| 134 | F | E | 11714 | 22 Sep-01 Oct 2003 |
| 135 | F | J | 15409 | 15 April 24 April 2006 |
| 139 | F | B | 11509 | 16-25 June 2003 |
| 140 | F | J | 15353 | 17-26 April 2006 |
| 141 | F | J | 15353 | 17-26 April 2006 |
| 146 | F | D | 11755 | 26 July-4 August 2004 |
| 147 | F | T | 11320 | 01-10 July 2003 |
| 149 | G | T | 11374 | 02-11 June 2003 |
| 150 | G | T | 11320 | 01-10 July 2003 |
| 152 | G | L | 14526 | 9-18 July 2005 |
| 153 | G | M | 11618 | 20-29 April 2003 |
| 154 | G | D | 8011 | 09-18 Sep 2003 |
| 155 | G | J | 11699 | 19-28 April 2004 |
| 156 | G | T | 11699 | 19-28 April 2004 |
| 159 | G | J | 16669 | 5-14 May 2008 |
| 160 | G | M | 16669 | 5-14 May 2008 |
| 161 | G | B | 11321 | 01-10 July 2003 |
| 163 | G | C | 11376 | 08-17 July 2003 |
| 164 | G | D | 10093 | 14-23 June 2004 |
| 165 | G | J | 10093 | 14-23 June 2004 |
| 166 | G | S | 20056 | 3-12 August 2009 |
| 167 | G | D | 19115 | 23-29 April 2008 |
| 169 | G | C | 16776 | 21-30 Oct 2006 |
| 170 | G | K | 16776 | 21-30 Oct 2006 |
| 171 | G | R | 9802 | 02-11 May 2005 |
| 172 | G | R | 14332 | 24 April-3 May 2006 |

| Ref # | Last | First | Booking # | Date |
|---|---|---|---|---|
| 180 | G | S | 19505 | 1-10 July 2009 |
| 181 | G | A | 17799 | 20-29 April 2008 |
| 182 | G | J | 13025 | 30 May-8 June 2005 |
| 185 | G | C | 11121 | 30 June-09 July 2003 |
| 186 | G | M | 20714 | 24 May-2 June 2010 |
| 187 | H | D | 11766 | 31 May-9 June 2004 |
| 188 | H | S | 11699 | 19-28 April 2004 |
| 189 | H | T | 20723 | 25 July-3 August 2011 |
| 190 | H | S | 11378 | 12-21 May 2003 |
| 192 | H | L | 20440 | 31 May-9 June 2004 |
| 193 | H | D | 14195 | 25 July-3 August 2005 |

| 194 | H | J | 11545 | 19-28 May 2003 |
| 197 | H | C | 11177 | 07-16 April 2003 |
| 198 | H | C | 12606 | 22-31 March 2004 |
| 200 | H | K | 16949 | 14-24 May 2007 |
| 201 | H | R | 16949 | 14-24 May 2007 |
| 204 | H | E | 10672 | 01-10 June 2003 |
| 206 | H | A | 20441 | 8-17 June 2009 |
| 207 | H | T | 10504 | 11-20 August 2003 |
| 208 | H | C | 10188 | 17-28 May 2003 |
| 209 | H | T | 14005 | 13-22 June 2005 |
| 211 | H | K | 19893 | 31 May-9 June 2004 |
| 214 | H | D | 12968 | 28 June-7 July 2004 |
| 215 | H | D | 12968 | 28 June-7 July 2004 |
| 218 | H | R | 18259 | 10-19 May 2008 |
| 225 | H | D | 15395 | 5-14 Sep 2006 |
| 227 | H | K | 18590 | 4-13 May 2008 |
| 228 | H | R | 11666 | 31 May-9 June 2004 |
| 229 | H | D | 12970 | 22 August-1 Sep 2004 |
| 230 | H | P | 13592 | 11-20 May 2005 |
| 231 | H | D | 10657 | 16-25 June 2003 |
| 233 | I | S | 12940 | 10-19 August 2004 |
| 235 | I | R | 10898 | 02-11 June 2003 |
| 236 | J | M | 20514 | 29 April-9 May 2010 |
| 237 | J | R | 20982 | 13-22 Sep 2010 |

| Ref # | Last | First | Booking # | Date | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 256 | K | H | 20407 | 6-15 June 2009 |
| 239 | J | S | 19733 | 14-20 May 2009 | 257 | K | N | 19978 | 19-28 June 2009 |
| 240 | J | C | 10613 | 11-20 August 2003 | 258 | K | V | 19978 | 19-28 June 2009 |
| 241 | J | D | 18590 | 1-10 May 2008 | 259 | K | N | 12077 | 11-23 June 2005 |
| 242 | J | J | 9359 | 14-23 July 2003 | 260 | K | T | 10613 | 11-20 August 2003 |
| 243 | J | R | 15849 | 14-23 May 2007 | 263 | K | K | 10613 | 11-20 August 2003 |
| 247 | J | R | 13715 | 8-14 August 2005 | 264 | K | W | 13888 | 5-14 Sep 2005 |
| 249 | K | B | 12248 | 19-28 April 2004 | 265 | K | G | 9596 | 14-23 July 2003 |
| 250 | K | G | 12248 | 19-28 April 2004 | 266 | K | C | 17331 | 2-11 April 2007 |
| 251 | K | G | 20717 | 27 April-6 May 2010 | 267 | K | G | 10438 | 09-18 June 2003 |
| 253 | K | W | 10374 | 02-11 June 2003 | 268 | K | C | 16492 | 3-13 August 2006 |
| 254 | K | W | 11414 | 02-11 June 2003 | 269 | L | M | 13703 | 26 June- 7 July 2007 |
| 255 | K | E | 10620 | 08-17 July 2003 | 270 | L | L | 20211 | 17-26 July 2009 |

| 271 | L | A | 14526 | 9-18 July 2005 | 334 | O | B | 13826 | 13-22 June 2005 |
|-----|---|---|-------|----------------|-----|---|---|-------|-----------------|
| 272 | L | J | 11373 | 05-14 June 2003 | 335 | O | M | 21097 | 9-18 July 2011 |
| 273 | L | N | 20378 | 30 June-11 July 2005 | 336 | P | D | 12670 | 9-16 August 2004 |
| 274 | L | G | 12779 | 14-23 July 2009 | 337 | P | B | 9922 | 28 July-06 August 2003 |
| 275 | L | J | 12779 | 14-23 July 2009 | 338 | P | R | 9922 | 28 July-06 August 2003 |
| 276 | L | J | 19034 | 20-29 July 2010 | 339 | P | C | 19065 | 20-29 May 2009 |
| 277 | L | C | 10927 | 28 July-6 August 2003 | | | | | |
| 279 | L | D | 20297 | 20-29 July 2010 | | | | | |
| 280 | L | G | 10664 | 19-28 May 2003 | | | | | |
| 282 | L | K | 16654 | 14-23 May 2007 | | | | | |

| 283 | L | S | 11884 | 07-20 July 2005 |
|-----|---|---|-------|-----------------|
| 286 | M | R | 20401 | 25 April-4 May 2011 |
| 287 | M | C | 15765 | 29 June-8 July 2007 |
| 288 | M | J | 11244 | 12-21 May 2003 |
| 290 | M | D | 13826 | 13-22 June 2005 |
| 293 | M | M | 20498 | 1-10 July 2009 |
| 294 | M | J | 13373 | 26 June-5 July 2005 |
| 295 | M | M | 11884 | 07-20 July 2005 |
| 297 | M | D | 9596 | 14-23 July 2003 |
| 300 | M | R | 15399 | 10-19 Sep 2006 |
| 301 | M | N | 18590 | 30 April-12 May 2008 |
| 302 | M | T | 17115 | 2-11 Sep 2007 |
| 304 | M | A | 18590 | 30 April-12 May 2008 |
| 305 | M | D | 11755 | 26 July-4 August |
| 306 | M | E | 11219 | 30 June-09 July 2003 |
| 309 | M | K | 11931 | 28 June-7 July 2004 |
| 311 | M | C | 9596 | 14-23 July 2003 |
| 312 | M | D | 17931 | 21-30 April 2010 |
| 313 | M | B | 16849 | 21-30 May 2007 |
| 315 | M | R | 13373 | 26 June-5 July 2005 |
| 316 | M | K | 20379 | 29 April-8 May 2010 |
| 320 | M | E | 10674 | 22-31 August 2003 |
| 321 | M | H | 19319 | 6-15 June 2009 |
| 322 | M | J | 20146 | 25 Sep-4 Oct 2009 |
| 323 | M | A | 12977 | 20-29 April 2006 |
| 326 | N | C | 16654 | 14-23 May 2007 |
| 327 | N | M | 9159 | 31 May-9 June 2004 |
| 328 | N | T | 11618 | 20-29 April 2003 |
| 330 | N | J | 10056 | 06-15 July 2003 |

| Ref # | Last | First | Booking # | Date | Ref # | Last | First | Booking # | Date |
|---|---|---|---|---|---|---|---|---|---|
| 340 | P | G | 11509 | 16-25 June 2003 | 396 | S | J | 10564 | 22-31 July 2003 |
| 341 | P | M | 18042 | 21-30 June 2008 | 398 | S | T | 13118 | 26 July-4 August 2004 |
| 342 | P | B | 20250 | 21 April-1 May 2010 | 399 | S | T | 18120 | 11-20 Sep 2007 |
| 345 | P | A | 11931 | 28 June-7 July 2004 | 400 | S | B | 11377 | 01-10 Oct 2005 |
| 346 | P | M | 17350 | 20-29 March 2008 | 401 | S | S | 11320 | 01-10 July 2003 |
| 348 | P | R | 13592 | 9-22 May 2005 | 403 | S | S | 14108 | 16-25 May 2005 |
| 350 | P | P | 17233 | 18-27 June 2007 | 404 | S | M | 12970 | 21 August-2 Sep 2004 |
| 351 | P | R | 19714 | 9-15 July 2009 | 406 | S | J | 11916 | 12-21 July 2004 |
| 353 | P | T | 19747 | 1-10 August 2011 | 407 | S | D | 12734 | 28 June-7 July 2004 |
| 354 | P | K | 13046 | 28 June-7 July 2004 | 408 | S | E | 20721 | 6-15 Sep 2010 |
| 357 | R | A | 10913 | 16-25 June 2003 | 410 | S | R | 16390 | 21-31 May 2007 |
| 361 | R | K | 19505 | 1-10 July 2009 | 414 | S | B | 11244 | 12-21 May 2003 |
| 362 | R | G | 20629 | 7-16 May 2010 | 415 | S | B | 11244 | 12-21 May 2003 |
| 363 | R | G | 15308 | 18-27 April 2006 | 419 | S | A | 13646 | 25-July-3 August 2005 |
| 365 | R | M | 20536 | 13-22 July 2009 | 420 | S | B | 11416 | 12-21 May 2003 |
| 366 | R | B | 11898 | 19-28 May 2005 | 424 | S | FJ | 11898 | 19-28 May 2005 |
| 367 | R | T | 13567 | 9 Sep-7 Oct 2004 | 427 | S | D | 10056 | 06-15 July 2003 |
| 368 | R | S | 10199 | 02-11 June 2003 | 429 | S | D | 15830 | 27 May-5 June 2007 |
| 369 | R | C | 8011 | 09-18 Sep 2003 | 431 | S | J | 15007 | 14-23 June 2007 |
| 370 | R | D | 17799 | 20-29 April 2008 | 433 | S | G | 17620 | 19-28 March 2007 |
| 371 | R | R | 13484 | 28 May-9 June 2005 | 434 | S | J | 17620 | 19-28 March 2007 |
| 373 | R | R | 15497 | 28 Feb-9 March 2006 | 436 | S | T | 20900 | 12-21 April 2010 |
| 374 | R | J | 15875 | 23 July-5 August 2007 | 437 | S | W | 11416 | 12-21 May 2003 |
| 375 | R | G | 20425 | 8-17 July 2010 | 439 | S | C | 10771 | 13-22 June 2003 |
| 376 | R | J | 10834 | 11-20 August 2003 | 440 | T | B | 14117 | 27 June-6 July 2005 |
| 377 | R | H | 10799 | 13-22 June 2003 | 441 | T | J | 14117 | 27 June-6 July 2005 |
| 378 | R | R | 11845 | 14-23 June 2004 | 444 | T | J | 13646 | 25 July-3 August 2005 |
| 380 | R | D | 19556 | 20-29 July 2009 | 446 | T | D | 17815 | 15-24 June 2009 |
| 382 | R | S | 10931 | 28 July-6 August 2004 | 448 | T | C | 10374 | 02-11 June 2003 |
| 385 | S | M | 10618 | 14-23 July 2003 | 449 | T | J | 20903 | 1-10 May 2010 |
| 386 | S | M | 12627 | 12-21 July 2004 | 450 | T | M | 20186 | 17-23 April 2010 |
| 387 | S | D | 14332 | 24 April-3 May 2006 | 455 | V | G | 11407 | 19-28 May 2003 |
| 388 | S | N | 14839 | 8-17 August 2005 | 457 | V | J | 13230 | 21-30 April 2005 |
| 389 | S | L | 9596 | 14-23 July 2003 | 458 | W | D | 16530 | 1-10 May 2007 |
| 394 | S | J | 17350 | 20-29 March 2008 | 459 | W | D | 13025 | 30 May- 8 June 2005 |

## LIST B

**Clients of the COA-Burchell Enterprise Who Hunted on Burchell Land with No Current or Valid Certificate of Adequate Enclosure and No Valid Permit.**
**Potential Violations of Lacey Act and of South African and Provincial Regulations Regarding CAE's, False Export Permit Documentation**

| Client | Initials | | | | | |
| Ref # | Last | First | Booking # | Date of Scheduled Hunt | Location | |
|---|---|---|---|---|---|---|
| 22 | A | M | 20145 | 16-22 April 2009 | S. Africa | |
| 29 | B | B | 17428 | 10-20 June 2008 | S. Africa | |
| 32 | B | B | 18086 | 20-29 July 2008 | S. Africa | |
| 33 | B | M | 18086 | 20-29 July 2008 | S. Africa | |
| 47 | B | C | 20811 | 6-15 Sep 2008 | S. Africa | |
| 48 | B | M | 20811 | 6-15 Sep 2008 | S. Africa | |
| 74 | C | J | 18089 | 1-9 July 2008 | S. Africa | |
| 78 | C | M | 18089 | 1-9 July 2008 | S. Africa | |
| 87 | C | R | 19397 | 22-28 April 2009 | S. Africa | |
| 88 | C | L | 18259 | 10-19 May 2009 | S. Africa | |
| 100 | D | J | 18089 | 1-9 July 2008 | S. Africa | |
| 112 | D | D | 19647 | 22-31 March 2009 | S. Africa | |
| 115 | D | D | 19733 | 14-20 March 2009 | S. Africa | |
| 118 | E | D | 19013 | 28 April 7 May 2009 | S. Africa | |
| 119 | E | G | 19013 | 28 April 7 May 2009 | S. Africa | |
| 121 | E | E | 19647 | 22-31 March 2009 | S. Africa | |
| 195 | H | J | 19008 | 16-22 Sep 2008 | S. Africa | |
| 205 | H | G | 19008 | 16-22 Sep 2008 | S. Africa | |
| 226 | H | P | 19733 | 14-20 March 2009 | S. Africa | |
| 232 | H | T | 18042 | 21-30 June 2008 | S. Africa | |
| 281 | L | W | 18119 | 31 May -9 June 2008 | S. Africa | |
| 303 | M | S | 19733 | 14-21 March 2009 | S. Africa | |
| 310 | M | C | 18147 | 15-26 Sep 2008 | S. Africa | |
| 318 | M | L | 19520 | 23 Aug -1 Sep 2008 | S. Africa | |
| 347 | P | M | 19733 | 14-20 March 2009 | S. Africa | |
| 372 | R | L | 19733 | 14-20 March 2009 | S. Africa | |
| 384 | S | L | 20145 | 16-22 April 2009 | S. Africa | |
| 397 | S | R | 18194 | 11-20 Sep 2008 | S. Africa | |
| 416 | S | T | 18134 | 30 June - 9 July 2008 | S. Africa | |
| 417 | S | A | 18692 | 10-19 June 2008 | S. Africa | |

| 418 | S | K | 18089 | 1-10 July 2008 | S. Africa | |
| 423 | S | J | 18147 | 1-10 Sep 2008 | S. Africa | |
| 426 | S | A | 17748 | 27 Jun - 10 Jul 2008 | S. Africa | |
| 435 | S | C | 20145 | 16-22 April 2009 | S. Africa | |
| 452 | T | G | 19051 | 24-28 May 2008 | S. Africa | |
| 492 | Z | S | 19865 | 20-29 March 2009 | S. Africa | |

## LIST C

**Potential Illegal Import -Export Of Animals Killed in Namibia, then Illegally Removed From Namibia Through South Africa To The United States On False Documents. A Majority of the Listed Namibia Hunting Clients Were Subjected to These Violations by the Enterprise. Some Also Were Subjects of the Illegal VAT Collection or Other Offenses**

| Ref # | Last | First | Booking # | Date of Scheduled | | |
|---|---|---|---|---|---|---|
| 3 | A | E | 9618 | 05-14 | June | 2002 |
| 9 | A | W | 9618 | 05-14 | June | 2002 |
| 34 | B | G | 8600 | 01-10 | Oct | 2002 |
| 68 | B | J | 10581 | 02-11 | Sep | 2002 |
| 136 | F | S | 9151 | 16-25 | Sep | 2002 |
| 138 | F | F | 9618 | 05-14 | June | 2002 |
| 145 | F | D | 9833 | 24-Jun | 3-Jul | 2002 |
| 177 | G | K | 10173 | 14-23 | June | 2002 |
| 212 | H | S | 10224 | 3-12 | August | 2002 |
| 213 | H | T | 9315 | 30-Jun | 9-Jul | 2002 |
| 219 | H | M | 9175 | 10-19 | Oct | 2002 |
| 223 | H | M | 9431 | 17-26 | August | 2002 |
| 234 | I | G | 9032 | 14-23 | July | 2002 |
| 262 | K | J | 9151 | 16-25 | Sep | 2002 |
| 291 | M | F | 10175 | 9-18 | Oct | 2002 |
| 292 | M | F | 10175 | 9-18 | Oct | 2002 |
| 298 | M | D | 9315 | 30-Jun | 9-Jul | 2002 |
| 329 | N | C | 9985 | 23-Jun | 2-Jul | 2002 |
| 413 | S | M | 10173 | 14-23 | June | 2002 |
| 438 | S | B | 9985 | 23-Jun | 2-Jul | 2002 |
| 451 | T | J | 10175 | 9-18 | Oct | 2002 |
| 8 | A | L | 10525 | 21-30 | July | 2003 |
| 58 | B | R | 10525 | 21-30 | July | 2003 |
| 79 | C | B | 11492 | 03-12 | Sep | 2003 |
| 86 | C | J | 10982 | 18-27 | August | 2003 |
| 90 | D | R | 10416 | 13-27 | July | 2003 |
| 110 | D | S | 10786 | 6-15 | June | 2003 |
| 123 | E | W | 10416 | 13-27 | July | 2003 |
| 148 | F | G | 11828 | 02-11 | Sep | 2003 |
| 158 | G | J | 10279 | 26-Apr 5-May | | 2003 |
| 196 | H | M | 11052 | 11-20 | May | 2003 |

| 222 | H | M | 9431 | 01-10 | March 2003 |
|---|---|---|---|---|---|
| 238 | J | R | 10525 | 21-30 | July 2003 |
| 252 | K | R | 10171 | 22-31 | July 2003 |
| 278 | L | C | 9431 | 01-10 | April 2003 |
| 314 | M | R | 11492 | 3-12 | Sep 2003 |
| 317 | M | T | 11023 | 1-10 | July 2003 |
| 319 | M | R | 10803 | 10-25 | June 2003 |
| 333 | O | A | 10416 | 13-27 | July 2003 |
| 352 | P | V | 10786 | 6-15 | June 2003 |
| 358 | R | S | 10465 | 7-16 | August 2003 |
| 379 | R | L | 11461 | 9-18 | April 2003 |
| 381 | R | G | 10982 | 18-27 | August 2003 |
| 392 | S | J | 10171 | 22-31 | July 2003 |
| 405 | S | J | 10777 | 30-Jun | 9-Jul 2003 |
| 442 | T | J | 10399 | 17-26 | June 2003 |
| 443 | T | J | 10399 | 17-26 | June 2003 |
| 483 | W | L | 10525 | 21-30 | July 2003 |
| 486 | W | B | 9999 | 1-12 | August 2003 |

| Ref # | Last | First | Booking # | Date of Scheduled | |
|---|---|---|---|---|---|
| 11 | A | J | 11426 | 30-Jun | 9-Jul 2004 |
| 17 | A | P | 11903 | 12-21 | April 2004 |
| 20 | A | R | 11765 | 07-16 | June 2004 |
| 21 | A | C | 13414 | 05-14 | July 2004 |
| 107 | D | E | 11672 | 19-28 | July 2004 |
| 108 | D | S | 11672 | 19-28 | July 2004 |
| 137 | F | S | 12012 | 19-28 | July 2004 |
| 142 | F | R | 12531 | 05-14 | July 2004 |
| 157 | G | C | 10636 | 30-Aug 8-Sep 2004 | |
| 183 | G | C | 10636 | 30-Aug 8-Sep 2004 | |
| 210 | H | A | 12516 | 19-28 | July 2004 |
| 221 | H | M | 9431 | 01-10 | March 2004 |
| 244 | J | T | 11765 | 7-16 | June 2004 |
| 299 | M | J | 12516 | 19-28 | July 2004 |
| 307 | M | T | 10104 | 02-11 | August 2004 |
| 324 | N | C | 11827 | 22-31 | March 2004 |
| 355 | P | T | 11903 | 12-21 | April 2004 |
| 383 | S | B | 7436 | 15-24 | March 2004 |
| 390 | S | J | 10663 | 10-19 | May 2004 |
| 391 | S | P | 12557 | 19-28 | August 2004 |
| 402 | S | D | 11827 | 22-Mar 1-Apr 2004 | |
| 454 | T | C | 12557 | 19-28 | April 2004 |
| 456 | V | J | 12557 | 19-28 | August 2004 |
| 43 | B | E | 14453 | 18-28 | April 2005 |
| 44 | B | M | 14453 | 18-28 | April 2005 |
| 82 | C | F | 13882 | 02-11 | May 2005 |
| 168 | G | B | 14566 | 19-29 | May 2005 |
| 199 | H | C | 14319 | 21-30 | March 2005 |
| 220 | H | M | 9431 | 01-10 | March 2005 |
| 349 | P | W | 13882 | 2-11 | May 2005 |
| 5 | A | M | 16277 | 15-24 | August 2006 |
| 203 | H | F | 14356 | 1-10 | May 2006 |
| 224 | H | M | 15606 | 01-10 | March 2006 |

| 296 | M | M | 16941 | 11-21 | June | 2006 |
|---|---|---|---|---|---|---|
| 343 | P | B | 16159 | 1-15 | August | 2006 |
| 425 | S | B | 15360 | 10-20 | July | 2006 |
| 428 | S | T | 16626 | 18-27 | Sep | 2006 |
| 430 | S | R | 15763 | 24-Jul | 3-Aug | 2006 |
| 54 | B | D | 17546 | 15-24 | July | 2007 |
| 71 | C | M | 16865 | 17-26 | March | 2007 |
| 81 | C | A | 17577 | 10-19 | August | 2007 |
| 216 | H | S | 16927 | 11-20 | August | 2007 |
| 261 | K | J | 16865 | 17-26 | March | 2007 |
| 412 | S | C | 17456 | 12-21 | Oct | 2007 |
| 445 | T | T | 17251 | 9-18 | August | 2007 |
| 453 | T | R | 17874 | 19-30 | August | 2007 |

| Ref # | Last | First | Booking # | Date of Scheduled | | |
|---|---|---|---|---|---|---|
| 7 | A | J | 19503 | 30-Aug 8-Sep 2008 | | |
| 116 | D | S | 18485 | 15-24 | August | 2008 |
| 143 | F | A | 17672 | 22-Jun | 4-Jul | 2008 |
| 144 | F | T | 17672 | 22-Jun | 4-Jul | 2008 |
| 173 | G | B | 19006 | 9-17 | June | 2008 |
| 174 | G | B | 19006 | 9-17 | June | 2008 |
| 175 | G | H | 19006 | 9-17 | June | 2008 |
| 178 | G | J | 17086 | 1-15 | May | 2008 |
| 202 | H | D | 19006 | 9-17 | June | 2008 |
| 248 | J | B | 17759 | 10-23 | Sep | 2008 |
| 284 | L | B | 19877 | 30-Jun | 10-Jul | 2008 |
| 285 | L | L | 18877 | 30-Jun | 10-Jul | 2008 |
| 289 | M | W | 17759 | 13-22 | Sep | 2008 |
| 308 | M | J | 18119 | 31-May 9-Jun | | 2008 |
| 325 | N | S | 16866 | 2-11 | August | 2008 |
| 331 | O | J | 17086 | 1-14 | May | 2008 |
| 332 | O | D | 17459 | 1-12 | May | 2008 |
| 356 | R | R | 18187 | 2-15 | July | 2008 |
| 409 | S | G | 18454 | 26-Jul | 5-Aug | 2008 |
| 411 | S | B | 19503 | 30-Aug 8-Sep 2008 | | |
| 421 | S | E | 18266 | 30-Jun | 9-Jul | 2008 |
| 432 | S | W | 18865 | 26-Jul | 4-Aug | 2008 |
| 464 | W | J | 18187 | 2-15 | July | 2008 |
| 472 | W | L | 15606 | 26-May 4-Jun 2008 | | |
| 474 | W | L | 18454 | 26-Jul | 5-Aug | 2008 |
| 475 | W | G | 16866 | 2-11 | August | 2008 |
| 25 | B | L | 20183 | 31-May 6-Jun 2009 | | |
| 26 | B | W | 20183 | 31-May 6-Jun 2009 | | |
| 45 | B | J | 19564 | 1-14 | August | 2009 |
| 46 | B | S | 19564 | 1-14 | August | 2009 |
| 151 | G | G | 19024 | 15-28 | August | 2009 |
| 162 | G | W | 19585 | 10-Jan August | | 2009 |
| 184 | G | K | 17874 | 19-30 | August | 2009 |
| 191 | H | C | 20511 | 1-10 | Oct | 2009 |
| 245 | J | D | 18470 | 20-29 | July | 2009 |
| 246 | J | D | 58523 | 20-29 | July | 2009 |
| 359 | R | M | 18051 | 15-24 | June | 2009 |
| 393 | S | J | 19024 | 15-28 | August | 2009 |

| 422 | S | B | 17732 | 30-Jun | 10-Jul 2009 |
| 37 | B | G | 20944 | | 20-May 5-Jun 2010 |
| 61 | B | D | 21043 | 6-16 | June 2010 |
| 64 | C | A | 21096 | 16-26 | July 2010 |
| 98 | D | L | 21092 | 18-28 | July 2010 |
| 114 | D | M | 20961 | 21-31 | July 2010 |
| 176 | G | R | 20973 | 11-21 | July 2010 |
| 344 | P | E | 21155 | 16-26 | August 2010 |
| 395 | S | J | 20665 | 31-Jul | 8-Aug 2010 |
| 447 | T | J | 19421 | -1-10 | June 2010 |
| 473 | W | B | 21139 | 3-13 | May 2010 |

| 63 | C | D | 16219 | | |
| 179 | G | D | 17638 | Cancel | |
| 217 | H | S | 20087 | 1-7 | May |
| 364 | R | M | 12602 | 3-12 | Sep |
| 469 | W | L | | | |

## LIST D

### COA and Cabela's Employees, Officers, Affiliated Writers and Others Connected to or Sponsored by Those Companies, Who Hunted With Burchell's Frontier Safaris. Most of These Hunters Were the Actors or Subjects of Violations of Falsified Export-Import Documentation, Unlawful Hunts Without Written Permission on Non-Owned Land, VAT tax violations by Frontier Enterprises or Other Violations of African law, and Consequent Lacey Act Violations. Some Entries under Date and Place of Hunt, Marked with a ??, Could Not Be Determined Because of Factual Discrepancies in the Documents

| | Last | First | Booking # | Date of Hunt | Place of Hunt |
|---|---|---|---|---|---|
| A | J | | 18590 | 29 Apr 12 May 2008 | South Africa |
| B | J | | COA | ?? | ?? |
| B | J | | 18590 | 29 Apr 12 May 2008 | South Africa |
| G | K | | 17874 | 19-30 Aug 2009 | Namibia // Africa |
| H | J | | . 19008 | 16-22 Sep 2008 | South Africa |
| H | G | | 19008 | 16-22 Sep 2008 | South Africa |
| H | C | | 10188 | 17-28 May 2003 | South Africa |
| H | K | | 18590 | 29 Apr 12 May 2008 | South Africa |

| L | C | 10927 | 28 July 6 Aug 2003 | South Africa |
| M | N | 18590 | 29 Apr 12 May 2008 | South Africa |
| M | A | 18590 | 29 Apr 12 May 2008 | South Africa |
| S | C | COA | ?? | ?? |
| S | G | COA | ?? | ?? |
| S | P | COA | ?? | ?? |
| T | R | 17874 | 19-30 Aug 2007 | Namibia // Africa |
| W | L | ???? | ?? | Namibia // Africa |
| W | K | 13315 | 30 May 8 June 2005 | South Africa |